RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────



NAYANABEN PATEL,

        *Petitioner*,

 *v.*

MERRICK B. GARLAND, Attorney General,

        *Respondent*.

No. 23-3461

─────────────────

On Petition for Review from the Board of Immigration Appeals.
No. A 089 213 082.

Argued:  January 30, 2024

Decided and Filed:  September 10, 2024

Before:  SILER, MATHIS, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Ainuddin Ahmed, AINE AHMED LAW, Carmel, Indiana, for Petitioner.  Jaclyn G. Hagner, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:**  Ainuddin Ahmed, AINE AHMED LAW, Carmel, Indiana, for Petitioner.  Jaclyn G. Hagner, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

 SILER, J., delivered the opinion of the court in which MATHIS, J., joined. BLOOMEKATZ, J. (pp. 14–27, app. 28–29), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

SILER, Circuit Judge.  Petitioner Nayanaben Patel[1] entered the United States in March 2000.  But exactly when, where, how, and with whom was never conclusively established.  She applied for adjustment of status based on her husband's legal status in the United States but lied about her manner of entry in doing so.  She admitted to lying in a statement to U.S. Citizenship and Immigration Services ("USCIS"), but then testified in 2019 in a manner that called into question elements of that statement as well.  Citing this factual confusion, the Immigration Judge ("IJ") denied her application for adjustment of status and ordered her removed to India.  The Board of Immigration Appeals ("BIA") affirmed.  Because the IJ's determination was discretionary and protected by statute from judicial review, and because Petitioner has not raised colorable constitutional claims reviewable by this court, we deny the petition for review.

**I.**

Petitioner, whose husband was already in the United States, left her native India and entered the United States sometime in early 2000.  She claims in her opening brief that she entered on March 3, 2000, and that she did so with the help of an Indian movie star, Shanti Priya—known as Shanti Ray to the public—by posing as her nanny during a trip to the United States.  Ray, who allegedly ran a business of sorts helping people get to the United States, was paid a considerable sum of money by Petitioner to secure her a tourist visa and then help her get to the United States and through customs.

Once in the United States, Petitioner lived with her husband.  They eventually had three children, all of whom are U.S. citizens.  Her husband petitioned for lawful status as a foreign worker on November 16, 2007.  That same day, Petitioner's attorney prematurely submitted an I-485 Petition for Adjustment of Status seeking to get Petitioner a green card based on her husband's work status.  She claims that her attorney's filing of this form notified

_____

[1]This opinion refers to Nayanaban Patel as "Petitioner" throughout to avoid confusion with the recent U.S. Supreme Court decision *Patel v. Garland*, which controls this case.

immigration officials of her illegal status and prompted them to initiate removal proceedings against her. She was served with a Notice to Appear ("NTA") on May 12, 2009.

In her I-485 application, Petitioner stated that when she first entered the United States she did so without inspection at Buffalo, New York, on March 31, 2000. Then, when interviewed under oath on her application by USCIS in 2008, she again claimed that she entered without inspection on March 31, 2000. However, the government noted that it was in possession of a tourist visa in her name, issued January 6, 2000, which listed her as a domestic employee of Ms. Ray. In response to a letter from USCIS requesting clarification, Petitioner submitted a narrative which claimed that she had entered the United States at Washington, D.C., and was "smuggled" into the country by Ms. Ray. She acknowledged that she had lied to immigration officials in her I-485 application and claimed she did so because of a fear of what Ms. Ray might do to Petitioner's family in India if she told the true story. Finally, she produced a copy of her visa that was issued on January 6, 2000, and expired July 5, 2000. Because Petitioner's husband had not been granted any visa, USCIS denied her I-485 application and initiated removal proceedings.

The process progressed slowly from here. Petitioner obtained several continuances to work with her attorney, and on May 10, 2010, filed a second I-485 Adjustment of Status petition based on her husband's now-approved I-140 visa. The IJ granted more continuances as the parties waited for Petitioner's husband's process to proceed and for her attorney to update medical and biometric information. During proceedings on August 14, 2012, the IJ continued again on the issue of Petitioner's I-485 petition, but also asked Petitioner to answer the pending NTA, which had been unanswered since filing in 2009. Counsel stated that Petitioner entered the United States without inspection at Buffalo, even though Petitioner previously admitted in writing that this account was a lie. She claims that her attorney was subsequently able to "correct the record."

The government opposed her petition for adjustment of status because of her fraud in obtaining a visa and entering the United States. This, it claimed, made her ineligible for admittance to the United States by virtue of 8 U.S.C. § 1182(a)(6)(C)(i), which prohibits admission of "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to

procure . . . a visa, other documentation, or admission into the United States or other benefit provided under this chapter." Petitioner therefore filed an I-601 ("Application for Waiver of Ground of Excludability") requesting the government waive her misrepresentation and allow her I-485 to proceed. The government, after several continuances and some initial confusion about her ability to use her husband as a "qualifying relative," agreed that she was theoretically eligible for a waiver, so long as she provided the court with required medical and biometric data.

But then, Petitioner and her family moved to Kentucky. Her counsel filed a change of venue request, and the court transferred the case to an IJ in Louisville, Kentucky. In 2017, before the new IJ, the government maintained that Petitioner had entered the United States without inspection, as she had admitted when she responded to the NTA. The IJ, relying on the information in the record, noted that her NTA indicated she entered without inspection. Petitioner's counsel argued that she had in fact admitted that this was a lie in a later statement provided to USCIS. The IJ and government counsel noted that this fact was not reflected in the NTA and that the NTA had not been amended. Petitioner's counsel tried to argue that the Philadelphia IJ had "addressed" the entry issue back in 2012 or 2013, but it became clear that the previous IJ had never actually issued a ruling on the issue. The government had noted that it intended to offer evidence that Petitioner entered with a visa at Washington, D.C., but that evidence was not yet entered. On appeal here, Petitioner argues that the issues of her fraud and entry without inspection were "resolved" by the government's apparent concession that she qualified for the I-601 waiver so long as she provided updated medical and biometric information. She argues that the Louisville IJ reopened settled issues.

On January 30, 2018, Petitioner's husband became a U.S. citizen, providing her with an alternate way to adjust her status.

On July 15, 2019, Petitioner appeared at a merits hearing. Her counsel filed a request for cancellation of removal, but the IJ rejected it because she did not meet the ten-year continuous presence requirement set forth in the statute. Instead, he focused on her still-pending 2010 application for adjustment of status. The IJ noted that the record showed she entered the country without inspection and no reliable evidence had been presented in rebuttal.

Petitioner testified at the hearing in support of her application for adjustment of status. She stated that she paid Ms. Ray approximately $12,000 to obtain her tourist visa and transport her to the United States. She traveled to the country in March 2000 with Ms. Ray and her one-year-old child, posing throughout as Ms. Ray's nanny. Once in Washington, D.C., her husband picked her up from the airport and she never saw Ms. Ray again. On cross-examination, the government's attorney asked her about her 2008 narrative to USCIS in which she admitted that she lied to immigration officials. She admitted that she wrote the letter. Counsel asked her why her USCIS narrative says she met Ms. Ray at the airport in Washington, D.C., and she had no answer. She also failed to explain why she stated that Ms. Ray drove her to a house in the United States instead of her husband picking her up at the airport, as she had just testified. Throughout, she stated that she was "scared, frightened," and that is why her testimony differed. When asked why her narrative stated that Ms. Ray had demanded more money from Petitioner and Petitioner refused to work for Ms. Ray, she admitted that she had again lied and that Ms. Ray never threatened her.

When her counsel attempted to rehabilitate her by asking why her testimony that day was so different from the USCIS narrative that denied the facts in her I-485 application, she responded, "I want to say sorry. Maybe I was scared, maybe I was frightened and because of that, I may have lied." She then questioned whether she had written the USCIS narrative, contradicting her testimony from earlier that day that she did write it.

Based on the contradictory facts, the IJ denied her application for adjustment of status. He found that there were two contradictory visa date ranges submitted, one introduced by USCIS and the other offered by Petitioner, and Petitioner's copy had additional information not present in the government's data. Therefore, he gave greater weight to the USCIS data. He further found that there was no evidence to support Petitioner's claim that she entered the United States in March 2000 via Washington, D.C., and her multiple contradictory statements regarding her manner of entry complicated the factfinding task. He found it very surprising that someone who had never been to the United States before would not remember what city she entered at or what methods she used to enter. She initially claimed that she had entered the United States without inspection, then that she entered without inspection by way of Buffalo, New York, and that she

traveled through Amsterdam and Toronto before traveling to Buffalo by bus. Then, in a narrative answer to a letter from USCIS requesting clarification, she admitted she lied and instead claimed she entered with a valid visa at Washington, D.C., and traveled by way of a twelve-hour layover in Singapore. Further, he noted the inconsistencies between her testimony on the day of his decision and this narrative to USCIS, which again contained several inconsistencies. She waffled on whether she wrote the USCIS narrative, testified to a different payment amount to Ms. Ray, and introduced several inconsistencies regarding what happened once she was in the United States.

The IJ essentially threw up his hands, stating he "doesn't know what to believe" regarding Petitioner's story. Because the "negative far outweighs the . . . [p]ositive" in the evidence, he denied her I-485 application for adjustment of status and ordered her removed to India. He also noted that her I-485 relied on her husband's I-140, which was not an adequate vehicle for her request because Petitioner's husband was now a U.S. citizen.

Petitioner appealed to the BIA. The BIA dismissed her appeal, upholding the IJ's decision. In doing so, it stated that the IJ's credibility finding was supported by the "material inconsistencies between the respondent's testimony and her supporting documentation." The court then went on to outline again the various inconsistencies between the factual record, Petitioner's I-485 application, her subsequent retraction, and the 2019 hearing testimony.

## II.

At root, this case concerns the degree to which this court may review the agency's discretionary denial of Petitioner's application for adjustment of status. Because Congress, as acknowledged by recent United States Supreme Court precedent, severely limits this court's ability to examine the agency's exercise of discretion, we must deny the petition for review.

## A.

If a qualified noncitizen wishes to become a lawful permanent resident of the United States, she must apply for and be approved for adjustment of status by following the procedures outlined in the Immigration and Nationality Act ("INA") § 245, codified at 8 U.S.C. § 1255.

The law provides different processes depending on whether the noncitizen entered the country with or without inspection. *See* 8 U.S.C. § 1255(a), (i). But both processes require the applicant to prove that she is eligible to receive an immigrant visa, that one is immediately available to her, and that she is admissible for permanent residence. *Id.* § 1255(a), (i)(2)(A)-(B). Petitioner bears the burden of establishing how she entered the country and that her case warrants a favorable exercise of discretion. *Patel v. Lynch*, 830 F.3d 353, 357 (6th Cir. 2016) (per curiam).

Congress established certain categories of aliens that are automatically ineligible for admission. *See* 8 U.S.C. § 1182. Among those is any alien who "by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter." *Id.* § 1182(a)(6)(C)(i). However, the Attorney General has discretion to waive this disability if he believes that refusing admission to the applicant "would result in extreme hardship to the citizen or lawfully resident spouse or parent of such an alien." *Id.* § 1182(i). Congress imposes no standard on this exercise of discretion other than that such hardship be proved "to the satisfaction of the Attorney General." *Id.*

If the Attorney General (or, more likely, an IJ exercising power delegated pursuant to 8 C.F.R. § 1240.1(a)(1)(ii)) refuses to waive a disability or grant adjustment of status under 8 U.S.C. § 1255 and orders the applicant removed, then Article III courts are categorically prohibited from questioning that decision. *See* 8 U.S.C. § 1252(a)(2)(B); *see also Patel v. Garland*, 596 U.S. 328, 339 (2022). The statute expressly holds that "[n]otwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review . . . any judgment regarding the granting of relief under section . . . 1182(i) . . . or 1255." 8 U.S.C. § 1252(a)(2)(B). The only exception lies in the "safe harbor" provision of subparagraph (D), which allows judicial review of "constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals." *Id.* at § 1252(a)(2)(D).

In 2022, the U.S. Supreme Court reaffirmed this standard in *Patel v. Garland*. There, the Court addressed the question of whether the bar on judicial review "precludes judicial review of factual findings that underlie a denial of relief," or only the final agency decision. *Patel*, 596

U.S. at 331. The Court closely studied the language of § 1252(a)(2)(B) and concluded that the use of the words "any" and "regarding" broadened the scope of the ban. *Id*. at 338. Because "the word 'any' has an expansive meaning . . . 'any' means that the provision applies to judgments 'of whatever kind' under § 1255, not just discretionary judgments or the last-in-time judgment." *Id*. (internal citation omitted). "Similarly, the use of 'regarding' 'in a legal context generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject.'" *Id*. (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)). Finally, the narrow "safe harbor" of subparagraph (D) allowing judicial review of constitutional and legal questions, adopted by Congress after the Court questioned the legality of a complete ban on judicial review, further shows that the jurisdiction-stripping provision is supposed to be universal except as to those two narrow issues. *Id*. at 340. This broad discretion and nearly universal ban does not offend our traditional notions of justice because "relief from removal is always a matter of grace." *Id*. at 332 (internal quotations omitted). "Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States[,]" and only authorizes deviation from those rules when the Attorney General determines that relief from removal would best serve the nation's interests. *Id*. at 331-32.

The IJ denied Petitioner's 2010 application for adjustment of status because she failed to carry her burden to show she qualified for relief. First, Petitioner used fraud in violation of 8 U.S.C. § 1182(a)(6)(C)(i) when she lied on her original application for adjustment of status. This made her categorically ineligible for admission under the statute because she "by fraud or willfully misrepresenting a material fact," attempted to secure "admission into the United States or other benefit provided under this chapter[.]" *Id*. The IJ had the power to waive this fraud, *see* 8 U.S.C. § 1182(i), but Petitioner never secured such a waiver. It is true that she was almost through the waiver process when her case was transferred—at her request—to another venue. But the new IJ viewed the facts differently and held that, because of what he considered to be contradictory visas submitted by Petitioner and USCIS and a dubious I-94, she had failed to bear her burden of proving where and how she entered the country—a necessary predicate to waiver under 8 U.S.C. § 1182(i).

Second, on the merits of her I-485 application, Petitioner failed to establish that she was "eligible to receive an immigrant visa and [was] admissible to the United States for permanent residence." 8 U.S.C. § 1255(a), (i). To satisfy this burden, she must show the time, place, and manner of her entry into the country. 8 U.S.C. § 1361. The IJ found that the factual record was too indeterminate, and that Petitioner failed to produce any evidence to support her assertion that she entered the country on March 31, 2000, in Washington, D.C. Additionally, she filed a fraudulent I-485 application and testified consistently with it during a sworn interview, but in a later written statement, admitted to lying. And what's more, her 2019 evidentiary testimony differed from the written statement. At each stage of the proceedings, Petitioner offered different testimony, with little explanation of why. Accordingly, the IJ found that she was not credible and had failed to bear her burden to qualify for adjustment of status under 8 U.S.C. § 1255.

Both these grounds—8 U.S.C. §§ 1182 and 1255—are expressly set forth in 8 U.S.C. § 1252(a)(2)(B) as discretionary judgments that we may not review. Therefore, we lack the power to question the agency's decision. As *Patel* stated, "[s]ection 1252(a)(2)(B)(i) strips courts of jurisdiction to review 'any judgment regarding the granting of relief' under § 1255." 596 U.S. at 336-37. It operates as a blanket prohibition on "review of *any* judgment *regarding* the granting of relief under § 1255 and the other enumerated provisions." *Id.* at 338 (emphasis in original). "That plainly includes factual findings." *Id.* at 339. And the carveout for constitutional and legal questions, viewed through the doctrine of *expressio unius est exclusio alterius*, likewise strongly implies that those two contexts are the only exceptions to the complete ban. *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (explaining the *expressio unius* interpretive canon). We therefore cannot question the Attorney General's exercise of discretion here.

**B.**

Perhaps recognizing the futility of directly questioning the IJ's exercise of discretion, Petitioner seeks to anchor her case within the "safe harbor" provision of 8 U.S.C. § 1252(a)(2)(D). As we discussed, this provision carves out a narrow class of challenges—those involving constitutional or legal questions—which federal courts may hear despite the categorical ban of § 1252(a)(2)(B). She alleges two violations of her constitutional rights: first,

that she received ineffective assistance of counsel which prejudiced her defense, and second, that she did not receive a fair hearing because the Louisville IJ was irredeemably biased against her.

Her claims fail for two reasons. First, neither claim was exhausted before the agency. And second, her judicial bias claim is not actually a constitutional claim but is instead a factual dispute presented as a constitutional issue.

The same statute—8 U.S.C. § 1252—that forecloses judicial review of the denial of Petitioner's application for adjustment of status also sets the boundaries on when we may review a final order of removal. That provision states that we "may review a final order of removal only if . . . the alien has exhausted all administrative remedies available." 8 U.S.C. § 1252(d). While the Supreme Court has made clear that this is a claim-processing rule and not a jurisdictional bar, *Santos-Zacaria v. Garland*, 598 U.S. 411, 416-17 (2023), there is good reason to allow the agency to first adjudicate Petitioner's claims. First, our distance from the proceedings and the parties renders such a fact-intensive inquiry as is required for an ineffective assistance of counsel argument difficult without further development by the agency. And second, Petitioner has filed a motion to reopen proceedings with the BIA raising these same arguments. We will allow the BIA to address these arguments before hearing them on appeal.

Second, Petitioner raises a claim of judicial bias on the part of the Louisville IJ. She correctly cites the governing law on the issue of fairness of the proceedings, but the facts that she alleges do not prove bias. Instead, she essentially questions his exercise of discretion.

Chief among her complaints is that she expected the Philadelphia IJ to rule in her favor on the issue of an 8 U.S.C. § 1182(i) waiver of her lies to the USCIS authorities. Then, when the case was transferred at her request to a new venue, the Louisville IJ tasked with the ultimate decision on the issue arrived at a decision different than what she expected in Philadelphia. She tried to argue to the new IJ that the issue of waiver eligibility was resolved, but he correctly pointed out that there had been no final decision. The fact that the Louisville IJ exercised his discretion differently than she expected the Philadelphia IJ to do is not grounds for reversal, nor is it evidence of judicial bias. Differences in the exercise of discretion are an artifact of

discretionary judgment. The Philadelphia IJ made no binding decisions regarding her adjustment of status, and the new IJ was entirely correct in stating that the issue was not settled.

She also makes two generalized assertions—without any supporting evidence—to claim that the new IJ "is certainly on a mission" and "had a proclivity to deny this case, conjuring up nonsensical reasons for denial." She claims that he "declines cases" well above the national average, and "even far more so" than other judges in his "conservative district," that he "weaponizes the immigration court proceedings as a mechanism for deportation," and was "set on denial from the outset and engaged in judicial activism." And she claims that "the transcript cannot truly inflect [sic] mannerisms or hostility of this particular IJ."

Yet Petitioner cites no evidence beyond the IJ's negative evaluation of her credibility and his discretionary judgments on the evidence before him. She claims that the IJ believed she was part of a "diabolical conspiracy" because he failed to "understand that people pay traffickers to enter this country" and questioned the existence of Ms. Ray. This is false. The IJ raised the question of whether Ms. Ray existed because the only evidence of her involvement was Petitioner's own testimony, which she had multiple times contradicted and admitted was false. She also claims that she had no motive to lie and that the USCIS documents clearly showed when she entered the country. This completely ignores her own testimony. She admitted to lying to USCIS—establishing that she did in fact lie and obviously had a motive to do so. She cannot ignore that lie and instead attempt to rely on the government's assertions of when and how she entered the country. She claims the IJ unreasonably criticized the copy of her visa, stating it was illegible when it was in fact "perfectly legible." But the visa presented to this court in the Administrative Record certainly appears less than "perfectly legible." She then nitpicks his verbiage at various points in the oral decision, particularly his retraction of the finding that Petitioner fraudulently created the visa and his notes that this was a complex case. We certainly found these facts very complex, but even if they are not, it is not evidence of bias to believe so. Finally, she argues that the USCIS narrative was mistranslated, and that it was legal error for the IJ to point out the discrepancies between that narrative and her 2019 in-court testimony. This is the first time she has raised this argument, and at the 2019 hearing she admitted that she wrote the narrative but never questioned its contents.

Petitioner claims all of these are "legal errors [made] in the course of exercising his discretion," but we fail to see how they are legal errors. They are simply a list of her disagreements with the IJ's interpretation of the facts, Petitioner's admitted lies, and the ensuing contradictions in the record. Because this judicial bias argument is not a legal or constitutional question reviewable by this court under 8 U.S.C. § 1252(a)(2)(D) and is instead a challenge to the IJ's exercise of his factfinding role, we cannot hear it.

**C.**

Although 8 U.S.C. § 1252(a)(2)(B) forecloses review of the IJ's decision, we do note that a significant error haunts this case. A visa, issued by a United States embassy or consulate, provides the holder a window of time in which she may travel to the United States and present herself to customs officials for entry into the country. It is not a guarantee of admission but does carry some weight because it bears the imprimatur of a United States government entity in the traveler's home country. If the visa holder is allowed entry into the United States by customs officials, she is issued an I-94 form, her entry is logged, and her passport stamped. The I-94 sets forth the dates the traveler is allowed to stay in the United States. Thus, the dates on a visa and an I-94 will almost certainly never match. The date range on the visa sets forth the timeframe in which the holder may present herself at the border for admission. The I-94 indicates how long the holder may stay in the country, once admitted.

In his oral decision denying her adjustment of status, the IJ castigated Petitioner for presenting a visa that did not align with the government's "visa." He even recommended that the government's attorneys refer the matter to the Fraud Detection and National Security Directorate ("FDNS") for investigation. But this concern rests on a fundamental error: the government never entered a copy of Petitioner's visa into the record. Instead, we have two government exhibits—the letter USCIS sent to Petitioner requesting that she clarify her manner of entry, and an I-797A form supplying Petitioner a replacement copy of her original I-94. Nothing else. The USCIS letter informs her that their "records demonstrate that on January 6, 2000, [she was] issued a visa as a non-immigrant visitor" indicating she was "the domestic employee of Shanti Ray." The letter provides no information on the valid dates of the visa. The I-797A form and the attached replacement I-94 show that she entered on a B2 visa and was allowed to stay in the country from

March 3, 2000, until September 2, 2000.  Notably, however, the form contains no information about her visa beyond the fact that she presented a B2 visa, and even contains the warning that "this form is not a visa nor may it be used in place of a visa."  The visa Petitioner offered shows that it was issued on January 6, 2000, and that she entered the country as the "domestic employee of Mrs Shanti Ray."  Not only does Petitioner's visa not contradict any government visa, it actually matches the USCIS letter in every respect.

The government, in its answering brief, and the IJ, in his oral decision, both conflate the I-797A and I-94 with a visa.  The government cites to the above-mentioned USCIS exhibits for the proposition that "Petitioner was issued a tourist visa to the United States on January 6, 2000, that was valid from March 3, 2000 until September 2, 2000."  This is not an accurate characterization of the evidence.  That I-797A form shows the details of Petitioner's I-94, not her visa.  Therefore, the two notations "Valid from 03/03/2000 to 09/02/2000" and "VALID FROM 03/03/2000 UNTIL 09/02/2000" refer to the I-94's dates she is allowed to stay in the country, not the visa, and the "B2" notation simply marks the type of visa upon which she was admitted.

In summary, the IJ repeatedly expressed concern that Petitioner's visa exhibit did not match up with the government's visa exhibit when there was no government visa in evidence.  It is more than a little disturbing that such sophisticated parties do not appear to know the difference between an I-94 and a visa, particularly when the forms are so visually different.  Ultimately, however, this error was only part of the IJ's reason for denying relief, and the decision was within his discretion on the grounds of Petitioner's other falsehoods.  We merely flag this error as guidance for future proceedings.

**III.**

Congress has expressly foreclosed judicial review of agency decisions such as those at issue here, and none of the subparagraph (D) exceptions apply.  *See* 8 U.S.C. § 1252(a)(2)(B).  Therefore, we deny the petition for review.

---

**DISSENT**

---

BLOOMEKATZ, Circuit Judge, dissenting. Nayanaben Patel is an Indian citizen who has lived in the United States for the past twenty-four years. Her husband and three children are U.S. citizens. She applied for adjustment of status through her husband, but the IJ concluded that she did not meet her burden to show that she was statutorily eligible because she failed to demonstrate when and how she entered the United States. Ms. Patel had a B2 visa and an I-94 entry form issued by the United States government proving these facts. But the IJ did not understand the legal significance of a B2 visa and how it differed from an I-94. So, the IJ not only concluded that Ms. Patel was ineligible for adjustment, but also that she was a liar who did not merit a favorable exercise of discretion. Based on that error, the IJ denied relief and ordered her removal, and the BIA affirmed, repeating the same mistake.

The majority opinion recognizes this "significant error haunts this case," but it affirms anyway by cabining the error as "only part" of the IJ's basis for denying relief. Maj. Op. at 14, 16. That's not true. This legal error infected the IJ's view of Ms. Patel's credibility and was so central to his decision that it was repeated by the BIA and defended vigorously by the government on appeal. The IJ and the BIA made an inexcusable legal error that this court is both authorized and obligated to correct. Accordingly, I would grant Ms. Patel's petition for review. I respectfully dissent.

**BACKGROUND**

To appreciate the scale and impact of the error that resulted in Ms. Patel's deportation order, it is helpful to understand how her case got here. I begin by summarizing how her long and convoluted journey through our immigration system—hindered at times by an alarmingly deficient attorney—culminated in today's Kafkaesque outcome.

Ms. Patel tells us that she entered the United States with a B2 visa on March 3, 2000. We know this is true because the government keeps meticulous arrival records, and those records say that this is when and how Ms. Patel entered. (More on those records later.)

*USCIS Proceedings.* In 2007, Ms. Patel's husband filed an I-140 petition, which is a form that noncitizen workers file to become lawful permanent residents. If the petition is approved, the noncitizen files an additional form called an I-485 to formally adjust their status. The noncitizen's spouse and children can also file I-485 forms of their own. These relatives are known as derivative beneficiaries of the principal applicant's petition. Ms. Patel's lawyer, who also represented her husband, made the mistake of filing an I-485 form for her on the same day that he filed her husband's I-140 petition. In other words, her lawyer prematurely filed her I-485 form before her husband's I-140 petition was approved.

Doomed timing aside, Ms. Patel's I-485 form faced another uphill battle. Ms. Patel did not have her passport because her trafficker, a woman named Shanti Ray, kept it and left her only with a photocopy of the passport page showing her B2 visa.[1] According to Ms. Patel, Shanti Ray was an Indian actress who ran a trafficking scheme to get women like Ms. Patel into the United States. For a significant sum of money, Ray would attest that these women worked as her nanny so they could get temporary visas to travel to the United States. Ms. Patel was terrified of the powerful and influential Ray, so she believed she had no means of recovering the passport. To sidestep the problem presented by the missing document, Ms. Patel said she entered the United States without inspection through Buffalo, New York on March 31, 2000, on her I-485 form and in the accompanying interview.[2]

Before USCIS issued a decision on Ms. Patel's I-485, it sent her a letter expressing confusion about her time, place, and manner of entry. USCIS records revealed that Ms. Patel had been issued a B2 visa on January 6, 2000, identifying her as an employee of Shanti Ray.

---

[1]Traffickers frequently confiscate the travel documents of their victims. *See, e.g.*, Trafficking Victim Protection Act, 18 U.S.C. § 1592 (attempting to curb this common practice by imposing penalties on traffickers who knowingly possess, remove, conceal, confiscate, or destroy a victim's passport, immigration document, or other official identification); *Identify and Assist a Trafficking Victim*, U.S. Dep't of State, https://perma.cc/5TVE-9SHF (urging concerned bystanders to ask potential victims of trafficking, "Do you have your passport/identification? Who has it?"); *What Is Human Trafficking? Myths and Misconceptions*, U.S. Dep't of Homeland Sec., https://perma.cc/H444-4RFZ (explaining that trafficking victims "may be afraid to come forward and get help" in part because "they may not be in possession of or have control of their identification documents").

[2]Ms. Patel was represented by the same attorney throughout her dealings with USCIS and before the IJ and the BIA. She retained new counsel for this appeal. On appeal, Ms. Patel alleges for the first time that she told her original lawyer about the missing passport, and that he urged her to lie and claim she entered without inspection in Buffalo. If true, this additional detail reveals a great deal about the quality of representation she received below.

The visa was valid until July 2000.  Given that Ms. Patel had an active visa in March 2000, it would have been strange for her to enter the country without inspection because she could have just used her visa to enter lawfully.  In response to USCIS's inquiry, on December 23, 2008, Ms. Patel admitted that she had lied.  She confirmed in a letter to USCIS that she did have a B2 visa issued on January 6, 2000, and that she used it to enter the country with inspection in Washington, D.C. on March 3, 2000.  She explained to USCIS that she was too frightened to say that Shanti Ray had trafficked her and kept her passport because Shanti Ray is well-connected in India and might have retaliated against Ms. Patel's family.  USCIS denied Ms. Patel's I-485 form about two months later.  Shortly thereafter, the government placed Ms. Patel into removal proceedings.

*Philadelphia Immigration Court Proceedings.*  In July 2009, Ms. Patel appeared for the first time in a Philadelphia immigration court.  Her case inched along sluggishly for the next few years, delayed at times by her unprepared attorney.  In August 2012, Ms. Patel's husband became a lawful permanent resident.  By this point, she could properly submit an I-485 as a derivative beneficiary of his successful I-140 petition, and her attorney told the Philadelphia IJ that he would update her file with new medical records and biometric information.  The IJ also noted that Ms. Patel had not yet answered the allegations in the original Notice to Appear that initiated the removal proceedings.  The Notice to Appear alleged that she entered without inspection, which of course was not true.  Ms. Patel's attorney recited the old and inaccurate story about how Ms. Patel entered the country without inspection through Buffalo on March 31, 2000, apparently forgetting that he had prepared and submitted a letter on Ms. Patel's behalf disavowing this story back in 2008.  Ms. Patel quickly acted to correct the misinformation. Moments later, after she spoke to her attorney and explained that he was wrong, he went back on the record to confirm that Ms. Patel had entered with a B2 visa through Washington, D.C., on March 3, 2000.  He told the IJ that Ms. Patel had a photocopy of the visa page of her passport, but she did not have her I-94 form.  An I-94 form is generated by Customs officers at U.S. ports of entry.  8 C.F.R. § 1.4 (2024).  It records the time and manner of a noncitizen's arrival. USCIS Policy Manual, Vol. 11, Part F, Ch. 1.  The I-94 would confirm Ms. Patel's story about when and how she entered the United States, so her attorney told the IJ that he would file a form requesting

a replacement I-94. Months later, USCIS provided Ms. Patel with her replacement I-94 showing that she had a B2 visa and entered the United States with inspection on March 3, 2000.

In February 2013, the government agreed that Ms. Patel could adjust through her husband's approved petition but noted that she would have to clear an additional hurdle. She had committed fraud in acquiring her B2 visa. The government said it would oppose her adjustment of status if she did not get a fraud waiver.

Ms. Patel's lawyer submitted her waiver form as directed. But at a hearing in May 2013, the government identified a barrier to waiver. The government asserted its mistaken belief that Ms. Patel could not use her husband as a qualifying relative on her waiver form. The IJ asked for clarification: "[I]s it the Government's position that she is ineligible to adjust her status?" A.R. PageID 131. The government replied that "it's questionable" because it suspected that some unidentified legal authority barred Ms. Patel from using her husband on her waiver form, but it admitted that it would have to do some research to confirm this. *Id.* So the IJ ordered both parties to submit briefs on the question. For the approximately four years that Ms. Patel had been in removal proceedings, neither the IJ nor the government had identified any other obstacle to Ms. Patel obtaining a fraud waiver or adjusting her status. Beside this "qualifying relative" question, the government agreed that Ms. Patel "is adjustable." A.R. PageID 134.

At the next hearing in March 2015, the IJ reiterated that the "issue as to whether [Ms. Patel] was eligible to adjust[]" was whether "her husband was a qualifying relative" for the purposes of the fraud waiver. A.R. PageID 152. The government conceded that it was wrong at the previous hearing. Ms. Patel was permitted to use her husband on the waiver form. The IJ then informed the parties that Ms. Patel's case could not be resolved that day because she still needed to submit updated medical reports, fingerprints, and tax records. So, it explained, relief "would not be able to be granted today for that reason," not for any other. A.R. PageID 153. The IJ explained to Ms. Patel that "the Government has said you are eligible to adjust your status through your husband, so that's resolved." A.R. PageID 158. The IJ also granted a change of venue to Memphis because the Patels were moving. That is when Ms. Patel's case took a sharp turn for the worse.

*Memphis/Louisville Immigration Court Proceedings.*   In 2017, the new IJ in Memphis held a hearing and asked whether Ms. Patel was eligible to adjust.  The government incorrectly replied that she entered without inspection.  Ms. Patel's lawyer tried to clear up the confusion, although he misstated some key facts.  The government's attorney reiterated that her Notice to Appear from 2009 alleged that she entered without inspection, and that she had admitted to it at an earlier hearing.  Ms. Patel's lawyer disagreed, explaining that the manner of entry was already addressed a few years prior—and indeed it was, back in 2012, when Ms. Patel's lawyer initially told the Philadelphia IJ that she entered without inspection on March 31, 2000, in Buffalo before Ms. Patel instructed him to go back on the record and clarify that she entered with inspection on March 3, 2000 in Washington, D.C.  But the IJ could only see the original Notice to Appear, not the clarification on the record that followed about how Ms. Patel actually entered the country. The government's attorney reviewed the case notes he had inherited from his predecessors in Philadelphia and said the last note in the file indicated that there would be a merits hearing scheduled for March 2015.  He added that "there's nothing in the notes that would indicate that the issue of eligibility has been resolved."  A.R. PageID 166.  These notes somehow overlooked the fact that a hearing *did* happen in March 2015, although not a final merits hearing, and that the IJ explicitly put on the record at that hearing that the government did not oppose Ms. Patel's eligibility to adjust her status.  In the absence of a final ruling from the Philadelphia IJ (recall, medical evaluations, tax records, and fingerprints needed updating), and given the inaccurate information the government presented to the Memphis IJ, that IJ scheduled the case for a full merits hearing on Ms. Patel's eligibility to adjust her status.

In July 2019, a third IJ in Louisville held a merits hearing to determine whether Ms. Patel was eligible to adjust her status under the Immigration and Nationality Act.[3]  For eligibility to adjust under that statute, Ms. Patel had to demonstrate the time, place, and manner of her entry into the United States.  *See* 8 U.S.C. §§ 1255(a), (i)(2)(A)–(B); *id.* § 1361.  Separately, she also

---

[3]By this time, Ms. Patel's husband had already been a naturalized citizen for a year and a half.  He had been a lawful permanent resident for about seven.  Counsel for the government observed at the July 2019 hearing that there is "a certain absurdity in trying to grant a derivative I-140" from many years ago based on a husband who is no longer an I-140 noncitizen worker.  A.R. PageID 205.  After that, Ms. Patel's attorney filed an I-130 form, which initiates the adjustment process for the spouse of a lawful permanent resident or U.S. citizen.

had to persuade the IJ that she warranted a favorable exercise of discretion.  *Matovski v. Gonzales*, 492 F.3d 722, 739 (6th Cir. 2007).

Focusing on the eligibility requirement, the IJ began the hearing by noting that there was some confusion about whether Ms. Patel entered without inspection or with a visa.  Ms. Patel's lawyer responded that she entered with a visa and directed the IJ to the replacement I-94 form confirming that fact.  But in a stunning moment of incomprehension, the IJ said that the I-94 "is just a document that tells us that she was issued a—a visa.  It does not provide any proof of her entry into the United States."  A.R. PageID 177.  The IJ was completely wrong. Ms. Patel's replacement I-94 form, like any other I-94 form, lists the date of her arrival, how long she was permitted to stay, and the kind of visa she used to enter.  But the IJ emphasized that there was a "big problem on the adjustment because there's no proof to support that she entered the United States lawfully with the visa."  A.R. PageID 178.

When she testified, she repeated the same story she had been telling since 2008, when USCIS asked her for clarification about her manner of entry.  Her account of the time, place, and manner of entry did not change; that is, she entered the United States in Washington D.C. with inspection on March 3, 2000.  But it hardly mattered.  The IJ could not account for the differences between the various documents he misidentified.  Because he erroneously believed that the I-94 should simply restate the information on the visa, he could not conceive of a reason why the date ranges on the I-94 and the visa would not match.  His confusion gave way to suspicion, and in his decision, he pointed an accusatory finger at Ms. Patel, insinuated that she submitted a doctored photocopy of her visa on purpose, and instructed the government's lawyer to report Ms. Patel's documents to USCIS's fraud detection office.

To be sure, some minor details in Ms. Patel's testimony differed from her representations to USCIS in 2008.  But recall that more than ten years had passed since then, and almost twenty years had passed since she arrived.  For example, did she pay her trafficker five thousand dollars or twelve thousand dollars?[4]  Did her trafficker fly with her from India, or did she meet her in the

---

[4]At oral argument, Ms. Patel's attorney pointed out that the exchange rate between Indian rupees and American dollars had changed between 2008 and 2019, which is why the dollar amounts differed.  If that's true, Ms.

airport?**5** The IJ, who was already deeply distrustful of Ms. Patel's government-issued documents, was emboldened by the inconsistencies in her story. He characterized Ms. Patel as a serial liar. Because he believed her to be an unreliable narrator, the IJ concluded that he could not trust her testimony regarding her time, place, and manner of entry, and denied her request for adjustment of status.

In short, all the record evidence Ms. Patel submitted—the replacement I-94 form, the photocopy of her B2 visa from her original passport, the USCIS letter from 2008 describing the government's internal record of the B2 visa—made no difference, because the IJ had little idea what it meant. Accordingly, the IJ decided that she was ineligible to adjust her status and commented offhandedly, almost as an afterthought, that she did not warrant a favorable exercise of discretion for the same reason. A.R. PageID 46 ("So based on [the credibility issues], the equities, uh, it's not even close. The—the—uh, do not—the negative far outweighs the—the positive in this case . . . .").

Ms. Patel appealed to the Board of Immigration Appeals and argued (among other things) that the IJ had misunderstood the documents, leading to its adverse credibility finding. The BIA responded by misunderstanding the documents again. It repeated the IJ's mistake with approval, upheld the IJ's finding that (despite the I-94 entry form provided by the government) Ms. Patel had not proved she "entered the United States in March 2000," and dismissed her appeal.**6** A.R. PageID 4–5.

---

Patel could have been answering the question honestly and accurately at both points in time, even though the answer changed.

**5**On appeal, Ms. Patel informs us that translation errors in her 2008 letter to USCIS were responsible for this discrepancy. She says she never told her attorney that Shanti Ray met her at the airport. Her attorney prepared the letter by asking her questions about her journey to the United States over the phone. She answered in her native Gujarati, and her husband acted as an interpreter. The letter was never read back to her in Gujarati so she could review its contents for accuracy.

**6**Ms. Patel has filed a motion to reopen with the BIA raising ineffective assistance of counsel and other arguments she advances before us on appeal. That motion is still pending.

**ANALYSIS**

**I.      The IJ's Error**

Because the IJ's error has been repeated at every phase of this case—by the BIA, by the government in its briefing before our court, and by the government again at oral argument—I feel I cannot go any further without explaining as simply as possible what a B2 visa is, what an I-94 is, and how they relate but differ. The following hypothetical clarifies how these two documents work.

Imagine that on New Year's Day, I receive a promotional coupon from a local gym for a three-month free trial. This offer won't last forever. I can't show up at the gym with the coupon a decade from now. The coupon has an expiration date; I have six months to use it. Let us also imagine that I let a few months go by. But in March, I feel a renewed sense of motivation, and I decide that I really ought to try out this gym. Luckily, my coupon has not expired yet, so I go to the gym, present it, and ask the employee to please activate my free trial. Because I am within the terms of the coupon, the employee starts my free trial, recording in the computer that the trial period begins today and ends in three months. Of course, after the three months are up, I cannot keep coming back to the gym for free—my trial is over. If you wanted to figure out how long I am allowed to use the gym without paying, you would not look to the issuance or expiration date printed on the coupon I received in the mail. That coupon would not tell you what day I finally decided to haul myself to the gym and redeem the offer. Rather, you would look at the record created on the day I arrived requesting my free trial.

B2 visas and I-94 forms operate the same way. A B2 visa is like a coupon that allows you to activate a temporary lawful stay in the United States. It is not valid forever. Once the government issues you the visa, you are required to travel to the United States before your visa (like the coupon) expires. At any point within that date range, you can go to a port of entry with your visa and ask to enter the United States. A Customs officer then records the date of your entry and the length of time you are allowed to stay in the United States in a document called an I-94 form. Critically, you are *not* necessarily allowed to stay in the United States until your visa expires. And equally true, you are not necessarily required to depart when your visa expires.

To lawfully enter the country, you must arrive before the expiration date specified on your visa. But once you are here, you must leave before the end date specified on your I-94 form. Accordingly, the date range for your visa—delineating when you can *enter* the United States—will rarely be the same as the date range on your I-94—which delineates your date of entry and period you can *stay* in the United States.

The difference between a visa and an I-94 form is a basic principle at the heart of our immigration system. Sometimes people with limited experience in this area confuse the two, which is why the State Department has published some helpful guides directed to the general public. *See, e.g.*, *What Is a U.S. Visa?*, U.S. Dep't of State, https://perma.cc/F9HC-YJFB; *What the Visa Expiration Date Means*, U.S. Dep't of State, https://perma.cc/R6EV-YBRK.[7] But an IJ should not have limited experience with our nation's immigration laws. Nor should the BIA. Nor indeed should the attorneys at the Office of Immigration Litigation.

It is hard to miss the perverse irony here: immigrants like Ms. Patel are expected to understand and abide by these deadlines, but the government's attorney could not grasp the difference between the two even when it was explained to her at oral argument with visual aids and other materials intended for a general audience.[8] And that confusion is "more than a little disturbing" because it has nightmarish consequences for Ms. Patel and her family. Maj. Op. at 16. Ms. Patel presented government-issued documents, verified by government agencies, to prove when and how she entered the country. Then, in a surreal turn, the government deemed the same documents false, and used them to brand Ms. Patel a liar and order her deportation.

---

[7]The first link provides a picture of a sample visa and explains that the expiration date "is the last day you can use your visa to seek entry into the U.S. It has nothing to do with how long you may stay in the U.S." *See* Appendix A. The second link cautions that "the visa expiration date and the length of time you have permission to remain in the United States" are "very different terms." It clarifies that the "visa expiration date is shown on the visa along with the visa issuance date." During the window of time between the issuance and expiration dates, "you are permitted to travel to a port-of-entry in the United States." In contrast, "[e]ntry and the length of authorized stay within the United States are determined by the Customs and Border Protection (CBP) Officer at the port-of-entry each time you travel" and recorded in an I-94. *See* Appendix B.

[8]Counsel for the government was asked what the dates on a B2 visa and an I-94 indicate. Counsel was repeatedly read information from Appendices A and B. But she remained adamant that the two date ranges should be the same. *See, e.g.,* Oral Argument at 21:10 ("I just, I'm not confident I agree with you [that the date ranges on a B2 visa and an I-94 are different], Your Honor."); *id.* at 21:20 ("Our position is that [the visa and the I-94] are conflicting."); *id.* at 30:04 ("I think that last part [about the date ranges being different as a matter of law] is the part I'm not necessarily agreeing with you on.").

It is impossible to cabin the IJ's astounding misinterpretation of Ms. Patel's documents and preserve the rest of his opinion. First, it is worth noting that the error is not relegated to a throwaway line, a footnote, or even a single paragraph. Almost half of the IJ's opinion is devoted to the documents. But length aside, even more troubling is the fact that the error infects everything that follows—it's the IJ's central reason for concluding that he cannot determine Ms. Patel's entry details and for deeming Ms. Patel not credible.

Because the IJ did not know what an I-94 signified, he ignored conclusive evidence from government-issued documents of Ms. Patel's time and manner of entry to the United States. This documentation alone should have resolved Ms. Patel's eligibility, just as the IJ in Philadelphia recognized. But the IJ found it "incredibly confusing" that Ms. Patel's visa date range "does not marry up" with the I-94. A.R. PageID 44. So, he reasoned that the only way Ms. Patel could prove her time, place, and manner of entry was through her own testimony.

The harm of the IJ's error did not end there—it distorted his view of Ms. Patel's credibility such that he would not rely on her testimony to determine the time, place, and manner of her entry either. The IJ began his decision by mocking Ms. Patel's visa photocopy as "something out of Fargo," complaining that it was "very illegible, almost on purpose" A.R. PageID 50. Despite his many complaints about the quality of the photocopy, the IJ evidently did not struggle to make out the dates or the annotation about Shanti Ray written on it, considering he discussed the dates and the annotation for much of his decision. He took a brief pause from harping on the visa to point out that Ms. Patel lied in her first USCIS interview—something Ms. Patel had conceded and explained over ten years prior—before circling back to the documents. The IJ found that the photocopy was fraudulent and that it gave rise to a "negative inference" about Ms. Patel's credibility, but then backtracked hastily when he realized that the photocopy matched the USCIS letter's description of the visa. But apparently USCIS's official records did not satisfy the IJ or affect his view of Ms. Patel's credibility. Indeed, the IJ continued to conclude that because the date ranges in the visa and I-94 "just don't square," he was not sure if the visa was "true or not." A.R. PageID 51. The IJ even directed the government's attorney to submit the documents to the Office of Fraud Detection and National Security because he was so troubled by the discrepancy, commenting on the "very serious" nature of Ms. Patel's potential

misconduct.   A.R. PageID 52.   Rather than entertain the possibility that he had overlooked something simple, the IJ went so far as to speculate that USCIS was an incompetent record-keeper, doubting that USCIS "actually did [its] homework" when it confirmed that Ms. Patel was issued a B2 visa.  A.R. PageID 51.

Immediately after that, the IJ pivoted to minor inconsistencies in Ms. Patel's testimony that were not relevant to her time, place, and manner of entry and used them to impugn her credibility.  He concluded that "everything in the letter [she sent to USCIS in December 2008] is untrue" because it was "almost opposite to everything she testified today."  A.R. PageID 52. This characterization is about as harsh as it is inaccurate, considering the relevant parts of Ms. Patel's story were identical between the 2008 letter and the testimony, including the when, where, and how she entered, plus the identity and general strategy of the trafficker that helped her do it.

Then, the IJ turned his skepticism toward Ms. Patel's underlying reason for presenting a photocopy instead of her original passport.  "It just doesn't make sense that she doesn't have—have her passport or her visa and that there's only copies out there," he insisted in his decision, and wondered why "this phantom person Shanti Ray would—would do that."  A.R. PageID 46. That is a strange observation given the widespread acknowledgement by the government that traffickers often confiscate the travel documents of their victims.  *See supra* note 1.

Maybe the IJ would have made an adverse credibility determination regardless of his error.  But I cannot ignore that he evaluated Ms. Patel's credibility and refused to exercise his discretion favorably in the shadow of his own mistaken understanding of the evidence, leading him to doubt Ms. Patel's honesty.  Against the backdrop of the IJ's profound error and resulting suspicion, could Ms. Patel ever receive a fair adjudication?

The majority recognizes that this "significant error haunts this case," but takes comfort in the fact that the error "was only part of the IJ's reason for denying relief."  Maj. Op. at 14, 16. Because Ms. Patel "offered different testimony" "[a]t each stage of the proceedings," the IJ was within his discretion to say that she had not met her burden to show time, place, and manner of entry, and therefore that she was ineligible for adjustment.  *Id.* at 10.  But as much as the

majority would like to neatly excise the IJ's "disturbing" error from the rest of his analysis, *id*. at 16, it is impossible.  As the majority itself explains, the IJ denied adjustment because Ms. Patel could not prove time, place, and manner of entry.  Meanwhile, the IJ had incontrovertible proof—produced not by Ms. Patel, but by the government itself—of her time and manner of entry that aligned with the story she had been telling consistently for the last ten years.  But the IJ ignored that proof because he did not understand it.  In fact, the IJ did worse than ignore it.  He used Ms. Patel's unassailable evidence against her.

## II.     Authority to Grant Relief

The government argues that Ms. Patel's claims are both outside the scope of our jurisdiction and unexhausted, making any relief impossible here regardless of whether we conclude that the IJ and the BIA erred.  I agree with the majority that these barriers foreclose review of some of Ms. Patel's other claims, which are not my focus here.  Maj. Op. at 11 (referring to Ms. Patel's ineffective assistance of counsel claim and her judicial bias claim).  But this pair of barriers does not prevent us from correcting the embarrassing legal error at the center of this case.

### A.     Jurisdiction

Congress limited our authority to review the agency's decision to deny adjustment of status.  8 U.S.C. § 1252(a)(2).  The Supreme Court has interpreted those restrictions to mean that we lack jurisdiction to review the factual findings underpinning a denial of relief.  *Patel v. Garland*, 596 U.S. 328, 338-40 (2022).  We can, however, address the constitutional and legal questions raised by the agency's decision.  8 U.S.C. § 1252(a)(2)(D); *Patel*, 596 U.S. at 331.  Ms. Patel argues that the IJ's mistake was a legal error.  She is right.  B2 visas and I-94 forms are official documents with a particular legal meaning.  They are defined and described in the Immigration and Nationality Act, the Code of Federal Regulations, and the USCIS policy manual. *See* 8 U.S.C. §§ 1201(a)(1)(B), (c)(2); 8 U.S.C. § 1202(e); 22 C.F.R. § 41.31(a); 8 C.F.R. § 1.4; USCIS Policy Manual, Vol. 11, Part F, Ch. 1.  Affording the wrong legal meaning to these documents contravenes these statutes and regulations, irrespective of any petitioner-specific information in the forms.  Quite simply, to conflate the two is to misstate their

legal meanings. Even the government agreed at oral argument that "what an I-94 is and what a B2 visa is" is "probably a legal question." Oral Argument at 28:06–29:02. This legal question underpins not only the IJ's eligibility determination, but his discretionary judgment as well, so neither of these alternative grounds for the IJ's decision are insulated from our review. *See Bernardino Murillo v. Barr*, 795 F. App'x 437, 441 (6th Cir. 2019) (recognizing that we have jurisdiction to consider "a legal or constitutional issue underlying the BIA's exercise of its discretion").

### B. Exhaustion

Additionally, Ms. Patel was required to exhaust this claim before the BIA prior to our review. 8 U.S.C. § 1252(d)(1). To exhaust, "immigrants must present the specific issue that they seek to raise in court" before the BIA so that it can correct it. *Singh v. Rosen*, 984 F.3d 1142, 1155–56 (6th Cir. 2021) (collecting cases).

Ms. Patel did exactly that. She brought the IJ's error to the BIA's attention in her statement of issues, describing the question as follows: "Does an immigration judge commit error when it finds that the respondent has not proven her date and time of entry when verifiable documents exists [sic] within the records from the state department and USCIS records that definativly [sic] prove date and time of entry." A.R. PageID 20. She elaborated, arguing that the IJ:

> ignore[d] the records, the I-102 results [replacement I-94 form], the original copy of the fax which Respondent provided regarding the I-94 and the State Department records, however, the Kentucky Immigration [sic] found that she's now ineligible for Adjustment of Status for failing to meet her burden of proof regarding time and place of entry. Counsel asserts this position is error.

A.R. PageID 22. Specifically, she pointed out that it was error for the IJ to conclude that she could not prove that she entered the United States in March 2000 with inspection even though her replacement I-94 form showed exactly that. In response, the BIA rubber stamped the IJ's decision, thereby squandering the opportunity to fix the IJ's legal error.

## CONCLUSION

We have jurisdiction to correct this obvious legal error, and we have a duty to do so. I believe we have fallen short of that duty here, and Ms. Patel will be subject to a deportation order as a result after living in this country for twenty-four years. Because I would grant the petition for review, I respectfully dissent.[9]

---

[9]Although this court denies Ms. Patel's petition for review, the government can still use its discretion to grant her relief. I urge the government to revisit this case and correct its error. Ms. Patel's husband is now a naturalized American citizen, which opens a new route to adjustment.

---

## APPENDIX A

---



Travel.State.Gov
U.S. DEPARTMENT of STATE — BUREAU of CONSULAR AFFAIRS

| Special Issuance Agency | U.S. Passports | International Travel | U.S. Visas | Intercountry Adoption | International Parental Child Abduction | Replace or Certify Documents |

| Tourism & Visit | Business | Employment | Study & Exchange | Immigrate | Other Visa Categories | U.S. Visa: Reciprocity and Civil Documents by Country |

Travel.State.Gov > U.S. Visas > Frequently Asked Questions > What is a U.S. Visa?

Share this page:

**Visa Applicants - State Sponsors of Terrorism Countries**

**What is a U.S. Visa?**

**About Visas - The Basics**

### What is a U.S. Visa?

A citizen of a foreign country who seeks to enter the United States generally must first obtain a U.S. visa, which is placed in the traveler's passport, a travel document issued by the traveler's country of citizenship.

Certain international travelers may be eligible to travel to the United States without a visa if they meet the requirements for visa-free travel. The Visa section of this website is all about U.S. visas for foreign citizens to travel to the United States.

(Note: U.S. citizens don't need a U.S. visa for travel, but when planning travel abroad may need a visa issued by the embassy of the country they wish to visit. In this situation, when planning travel abroad, learn about visa requirements by country, see Country Specific Travel Information in the Passport section of this website.)

### How Can I Use a Visa to Enter the United States?

Having a U.S. visa allows you to travel to a port of entry, airport or land border crossing, and request permission of the Department of Homeland Security (DHS), Customs and Border Protection (CBP) inspector to enter the United States. While having a visa does not guarantee entry to the United States, it does indicate a consular officer at a U.S. Embassy or Consulate abroad has determined you are eligible to seek entry for that specific purpose. DHS/CBP inspectors, guardians of the nation's borders, are responsible for admission of travelers to the United States, for a specified status and period of time. DHS also has responsibility for immigration matters while you are present in the United States.

### What Types of Visas Are There?

The type of visa you must obtain is defined by U.S. immigration law, and relates to the purpose of your travel. There are two main categories of U.S. visas:

- Nonimmigrant visas – For travel to the United States on a temporary basis. Learn more.
- Immigrant visas – For travel to live permanently in the United States. Learn more.

### Reading and Understanding a Visa



| Check that your ppt number is correct. | Check that your name is spelled correctly. | Where your visa was issued. | Check that your date of birth is correct. | "R" means "regular" passport. "Class" is the type or visa. See "The class of visa by your purpose of travel". |

"M" means that you can seek entry into the U.S. multiple times. If there is a number here, you may apply for entry that many times.

"Annotation" may include additional information about your visa. For example, on a student visa, it will show your SEVIS number and name of your school.

"Expiration Date" is the last day you can use your visa to seek entry into the U.S. It has nothing to do with how long you may stay in the U.S. See "What is a Visa?"

### Additional Resources

Please visit these webpages as well as selections on our website's left toolbar:

- Browse this useful A-Z subject index related to visas.
- Review Frequently Asked Questions about visas.
- See the latest Visa News.

**More Information**



A-Z Index
Latest News
Diversity Visa Program
Visa Waiver Program
Fraud Warning
Find a U.S. Embassy or Consulate
Straight Facts on U.S. Visas



**IN THE UNITED STATES: VISIT THE USA**



**FAQS: ABOUT VISAS - THE BASICS**

## APPENDIX B



Travel.State.Gov
U.S. DEPARTMENT of STATE — BUREAU of CONSULAR AFFAIRS

Search

| Special Issuance Agency | U.S. Passports | International Travel | U.S. Visas | Intercountry Adoption | International Parental Child Abduction | Replace or Certify Documents |

| Tourism & Visit | Business | Employment | Study & Exchange | Immigrate | Other Visa Categories | U.S. Visa: Reciprocity and Civil Documents by Country |

Travel.State.Gov > U.S. Visas > What the Visa Expiration Date Means

Share this page:

### What the Visa Expiration Date Means

- What the Visa Expiration Date Means
- Admission to the United States and your Duration of Stay
- Extension of Stay
- What if I Decide to Stay Longer and am Out-of-Status with the Department of Homeland Security?

Sometimes understanding the difference between the visa expiration date and the length of time you have permission to remain in the United States can be confusing. These are very different terms. Also review our "What is a U.S. Visa?" webpage.

- A U.S. visa in his/her passport gives a foreign citizen permission to apply to enter the United States. A visa by itself doesn't authorize entry to the U.S. A visa simply indicates that your application has been reviewed by a consular officer at a U.S. Embassy or Consulate, and that the officer determined you're eligible to travel to a U.S. port-of-entry for a specific purpose. The port-of-entry can be an airport, a seaport or a land border crossing.
- At the port-of-entry, a U.S. immigration officer of the Department of Homeland Security (DHS) decides whether to allow you to enter and how long you can stay for any particular visit, as part of the Admission process. Only the U.S. immigration officer has the authority to permit you to enter the United States.

### What the Visa Expiration Date Means

The visa expiration date is shown on the visa along with the visa issuance date. The time between visa issuance and expiration date is called your visa validity. The visa validity is the length of time you are permitted to travel to a port-of-entry in the United States.

Depending on your nationality, visas can be issued from a single entry (application) up to multiple/unlimited entries.

- A visa issued for a single entry (denoted on the visa under "Entries" with the number 1) is valid, or can be used from the date it is issued until the date it expires to travel to a U.S. port-of-entry one time.
- A visa issued for multiple entries (denoted under "entries" with a certain number (2, 3, etc.) or "M" for multiple/unlimited entries) is valid, or can be used from the date it is issued until the date it expires to travel to the U.S. port-of-entry as many times as your visa states, provided that:
  - Applying for a new visa is not necessary if your visa has not expired and you have not exceeded the number of entries permitted on your visa.
  - Multiple uses of a visa must be for the same purpose of travel allowable on the type of visa you have.

Please be aware, a visa does not guarantee entry to the United States. Additionally, the visa expiration date shown on your visa does not reflect how long you are authorized to stay within the United States. Entry and the length of authorized stay within the United States are determined by the Customs and Border Protection (CBP) Officer at the port-of-entry each time you travel.

It is important to note that there are circumstances which can serve to void or cancel the period of visa validity. If you overstay the end date of your authorized stay, as provided by the CBP officer at a port-of-entry, or United States Citizenship and Immigration Services (USCIS), your visa will automatically void or cancel unless;

- You have filed an application in a timely manner for an extension of stay or a change of status;
- That application is pending and not frivolous;

If you have applied for adjustment of status to become a permanent resident (LPR, also called green card holder), you should contact USCIS regarding obtaining Advance Parole before leaving the United States.

### Admission to the United States and your Duration of Stay

Upon arriving at a port of entry, the CBP official will determine the length of your visit.

On the admission stamp or paper Form I-94, the U.S. immigration inspector records either an admitted-until date or "D/S" (duration of status). If your admission stamp or paper Form I-94 contains a specific date, then that is the date by which you must leave the United States. If you have D/S on your admission stamp or paper Form I-94, you may remain in the United States as long as you continue your course of studies, remain in your exchange program, or qualifying employment. **The admitted-until date or D/S notation, shown on your admission stamp or paper Form I-94 is the official record of your authorized length of stay in the United States. You cannot use the visa expiration date in determining or referring to your permitted length of stay in the United States.**

Carefully review information about international visitor admission on the CBP Website.

#### More Information

A-Z Index
Latest News
What is a U.S. Visa?
Diversity Visa Program
Visa Waiver Program
Fraud Warning
Find a U.S. Embassy or Consulate
Straight Fact on U.S. Visas



IN THE UNITED STATES
VISITTHEUSA



FAQ'S: ABOUT VISAS THE BASICS